

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>vs.<br><br>ANGELICA JO WHITEMAN,<br><br>Defendant/Movant. | Cause No. CR 16-82-BLG-SPW-02<br>CV 19-80-BLG-SPW<br><br>ORDER DENYING § 2255 MOTION AND GRANTING AND DENYING CERTIFICATE OF APPEALABILITY |
|---|---|

Defendant Angelica Jo Whiteman, a federal prisoner proceeding *pro se*, moves to vacate or set aside her sentence under 28 U.S.C. § 2255. She pled guilty to aiding and abetting the first-degree murder of Roylynn Rides Horse and is currently serving a 480-month prison term.

## I. *Castro* Notice and Filing of § 2255 Motion

On July 18, 2019, Whiteman wrote a letter to the Court asking for "the opportunity to file for an appeal" and for new counsel to represent her. She stated that she "was not advi[s]ed by . . . legal counsel that I had a right" to appeal. Letter (Doc. 399) at 1. The Court responded by explaining Whiteman's time to appeal had expired and could not be extended. *See* Order (Doc. 400) at 1.

Because Whiteman's letter could, with liberal construction, be interpreted to allege that counsel were ineffective, the Court also explained that Whiteman's

1

letter could be construed as a motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255. Whiteman was given an opportunity to either withdraw her letter or proceed under § 2255. She was also advised that she must provide a more thorough factual basis for her claim regarding appeal. *See id.* at 1–2; *Castro v. United States*, 540 U.S. 375, 377 (2003).

On August 5, 2019, Whiteman filed a motion under 28 U.S.C. § 2255 (Doc. 401). The Court asked her to clarify one allegation. *See* Order (Doc. 402) at 1. Whiteman responded on August 28, 2019 (Doc. 401). Her response, however, raised another claim requiring clarification. *See* Order (Doc. 402) at 1. Whiteman again responded on September 4, 2019 (Doc. 403).

## II. Preliminary Review

Before the United States is required to respond to Whiteman's motion, the Court must determine whether "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts. A petitioner "who is able to state facts showing a real possibility of constitutional error should survive Rule 4 review." *Calderon v. United States Dist. Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolas*") (Schroeder, C.J., concurring) (referring to Rules Governing § 2254 Cases). But the Court should "eliminate the burden that would be placed on the respondent by

ordering an unnecessary answer." Advisory Committee Note (1976), Rule 4, Rules Governing § 2254 Cases, *cited in* Advisory Committee Note (1976), Rule 4, Rules Governing § 2255 Proceedings.

## III. Background of the Criminal Case

### A. Investigation

The following description of the evidence excludes Whiteman's own statements at her plea colloquy and in her testimony at Dimarzio's trial. The point is to summarily indicate what Whiteman's lawyers had to work with before and after she pled guilty.

On April 17, 2016, a rancher who had stopped his truck on Castle Rock Road on the Crow Indian Reservation came across Rides Horse. She was naked, badly beaten, frostbitten, and very severely burned. She received emergency treatment at Crow Agency Hospital and was immediately transferred to the University of Utah Hospital Burn Center.

Investigators quickly focused on a local bar. Patrons and surveillance video indicated Rides Horse got into an argument with her boyfriend at the bar on April 16. Whiteman was at the bar with Dimarzio Sanchez, Frank Sanchez,[1] and two other girls, juveniles at the time, S.F. and J.T. The video showed Whiteman and

---

[1] The Sanchezes are half-brothers. For clarity, this Order will use their first names. Larry Sanchez was with the others at the bar but parted company with them before the events that led to Rides Horse's death.

3

Rides Horse began talking and went outside together.

Investigators located Dimarzio, Frank, S.F., and J.T., but they could not locate Whiteman. Dimarzio told investigators he and Whiteman dropped Rides Horse off at a trailer in Dunmore and left the car in Crow, but no corroborating facts or witnesses were found. The car was located eventually but contained no useful evidence. A search warrant for Dimarzio's residence led to the discovery of a clump of hair and what appeared to be remnants of burnt clothing in a firepit.

Dimarzio, Frank, J.T., and S.F. all agreed that Rides Horse left the bar with them because Whiteman and Dimarzio were going to give her a ride to Crow Agency. Frank and S.F. told different stories in the first few weeks of the investigation. At trial, J.T., S.F., and Frank all agreed on the following facts:

1. Whiteman started fighting with Rides Horse in the car. *See* 1 Trial Tr. (Doc. 326) at 83:2–84:9 (J.T.); 3 Trial Tr. (Doc. 328) at 261:7–12 (S.F.), 446:3–7 (Frank).

2. Whiteman either told Dimarzio to pull over, *see* 1 Trial Tr. (Doc. 326) at 84:11–12 (J.T.); 3 Trial Tr. (Doc. 328) at 261:9–12, 262:2–4 (S.F.), or said something to Dimarzio, and Dimarzio altered their course by turning off the route to Crow, *see* 3 Trial Tr. at 446:9–11 (Frank).

3. Whiteman pulled Rides Horse out of the car. *See* 1 Trial Tr. (Doc. 326) at 100:6–101:1 (J.T.) (pretrial interview); 3 Trial Tr. (Doc. 328) at 264:17–21, 295:17–18 (S.F.), 446:7–10, 467:9–468:11 (Frank).

4. At one point, Whiteman thought she killed Rides Horse. *See* 1 Trial Tr. at 88:1–14 (J.T.); 3 Trial Tr. at 269:3–11 (S.F.), 453:17–18 (Frank).

5. Whiteman was behind the car, not sitting inside it, when someone

4

doused Rides Horse with gasoline and set her on fire. *See* 1 Trial Tr. at 88:14–89:9, 115:5–10 (J.T.); 3 Trial Tr. at 271:12–272:2, 308:4–6 (S.F.), 454:4–17 (Frank).

J.T.'s and S.F.'s testimony showed that Whiteman intended to kill Rides Horse. J.T. said Whiteman got back out of the car after one of the Sanchezes told her she "didn't finish it." *See* 1 Trial Tr. (Doc. 326) at 88:1–14. S.F. recalled the same thing. *See* 3 Trial Tr. (Doc. 328) at 269:7–11. S.F. also reported that Whiteman said she was going to kill Rides Horse. *See* 3 Trial Tr. (Doc. 328) at 267:17–24, 294:20–295:16.

**B. Procedural History**

On May 11, 2016, Whiteman was arrested in Billings, apparently on a warrant issued by the Northern Cheyenne Tribal Court. *See* 3 Trial Tr. (Doc. 328) at 373:17–22; 4 Trial Tr. (Doc. 331) at 547:10–19, 566:18–567:12; Pretrial Servs. Report (Doc. 14) at 2 (under seal) (showing Whiteman was transported from tribal jail). Whiteman and Dimarzio were charged by complaint with assault with intent to commit murder. They appeared in this Court on June 22, 2016. *See* Compl. & Aff. (Docs. 1, 1-1); Minutes (Doc. 5).

Although doctors treated Rides Horse for months, she died from her burns on June 28, 2016. On July 22, 2016, a grand jury indicted Whiteman, Dimarzio, and Frank on one count of first-degree murder, a violation of 18 U.S.C. § 1111. The United States pled an aiding-and-abetting theory. *See* 18 U.S.C. § 2.

Jurisdiction was predicated on the Major Crimes Act, 18 U.S.C. § 1153(a). *See* Indictment (Doc. 16) at 1–2. If convicted of first-degree murder, Whiteman faced life in prison. *See* 18 U.S.C. § 1111(b). Vernon Woodward was appointed to represent Whiteman. *See* Order (Doc. 13).

Because the critical evidence consisted of participants' statements, all three co-defendants were scheduled for separate trials. *See, e.g., Gray v. Maryland*, 523 U.S. 185 (1998); *Bruton v. United States*, 391 U.S. 123 (1968). With Frank's trial set for April 10, 2017, Whiteman's for April 24, and Dimarzio's for May 8, *see* Orders (Docs. 80, 81, 82, 98, 99), Frank pled guilty to a superseding information charging him with one count of being an accessory after the fact and one count of misprision of a felony, violations of 18 U.S.C. §§ 3 and 4, respectively. The elements of the offenses described in Frank's plea agreement specifically referred to Dimarzio's and Whiteman's commission of first-degree murder or aiding and abetting first-degree murder. *See* Frank Plea Agreement (Doc. 112) at 3–4; Frank Minutes (Doc. 118).

Likely recognizing the high likelihood that Frank would be called to testify against Whiteman if she went to trial, Whiteman's counsel obtained the transcript of Frank's plea colloquy. *See* Transcript Designation Order Form (Doc. 120). The United States' offer of proof, endorsed by Frank in open court and under oath, *see* Change of Plea Tr. (Doc. 121) at 3:13–24, 29:10–17, stated, in part:

6

>
> Whiteman dragged the victim out of the car and continued to beat her and tried to strangle her. At one point, Dimarzio Sanchez showed Whiteman how to strangle the victim using a bandana.
> The victim was stripped naked and beaten unconscious.
> Dimarzio Sanchez told Frank Sanchez to retrieve a gas can from the trunk of the car. Dimarzio Sanchez poured gasoline on the victim and then set her on fire. Dimarzio Sanchez, Whiteman, Frank Sanchez, and the other two individuals left the area.

Frank Change of Plea Tr. (Doc. 121) at 27:24–28:8.

On her motions, Whiteman's trial was continued to May 22, then July 31, then September 25, 2017. *See* Orders (Docs. 115, 134, 148).

On August 8, 2019, the parties filed a plea agreement. Whiteman agreed to plead guilty to aiding and abetting Dimarzio's commission of first-degree murder. *See* Plea Agreement (Doc. 159) at 2–3 ¶ 4. Whiteman waived her right to appeal. *See id.* at 6 ¶ 8. The parties acknowledged the possibility that Whiteman might provide substantial assistance and receive a reduced sentence, but neither party made any promises. *See id.* at 7–8 ¶ 9. In open court, on August 30, 2017, Whiteman admitted facts sufficient to support conviction for aiding and abetting first-degree murder and pled guilty. *See* Change of Plea Tr. (Doc. 179) at 29:14–34:24.

Before her sentencing, Whiteman testified at Dimarzio's trial. *See* Dimarzio Minutes (Doc. 251); 3 Dimarzio Trial Tr. (Doc. 328) at 65:10–150:11. So did Frank, S.F., and J.T. On December 7, 2017, the jury found Dimarzio guilty of first-degree murder. *See* Dimarzio Verdict (Doc. 260) at 1.

After trial, Dimarzio moved for a new trial based in part on new evidence. The day after his trial ended, a person brought a cell phone to the FBI. She had recently bought the phone from someone else and discovered a calendar note in it. An alert was scheduled to repeat yearly on April 17 at 9:00 a.m. The note, titled "Roylyn Rideshorse," stated:

> I should have told the truth about what I did. Now I'm full of regret not of what happen but I told them what somewhat happen I was apart of it.. I beat her in the car a bit I kicked her on the side of the head I helped find the gas can. I felt so alone when I found out they got caught.

U.S. Resp. to Dimarzio Mot. for New Trial Ex. 1 (Doc. 307-1 at 1).

Forensic analysis indicated the note was created on June 22, 2016, the day Whiteman and Dimarzio were arrested by federal authorities. Agents traced the phone back through at least seven purchasers in 2017 alone and found it might have belonged to or been used by J.T. At the hearing on Dimarzio's motion for new trial, J.T. denied writing the calendar note, but the Court found she might have. However, even assuming J.T. wrote it and its content was true, the Court found the note incriminated J.T. without exculpating anyone else. It might have been used as impeachment evidence, but even if it undermined J.T.'s credibility, it would not alter the basic picture presented by the evidence. Dimarzio's motion for new trial was denied on November 26, 2018. *See* Dimarzio Order (Doc. 354) at 27.

Whiteman was sentenced on December 21, 2018. *See* Minutes (Doc. 378). The mandatory minimum statutory penalty was life, *see* 18 U.S.C. § 1111(b), and life was also the advisory guideline range, *see* Presentence Report ¶¶ 35–45, 50, 92; Statement of Reasons (Doc. 385) at 1 § I(A). The Court departed downward from a life sentence and imposed a prison term of 480 months, to be followed by a five-year term of supervised release. *See* Judgment (Doc. 384) at 2–3.

Whiteman did not appeal. At the latest, her conviction became final on January 9, 2019. *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). Her § 2255 motion is timely. *See* 28 U.S.C. § 2255(f)(1).

### IV. Claims and Analysis

Whiteman claims that counsel was ineffective in various respects. These claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). At this stage of the proceedings, Whiteman must allege facts sufficient to support an inference (1) that counsel's performance fell outside the wide range of reasonable professional assistance, *id.* at 687-88, and (2) that there is a reasonable probability that, but for counsel's unprofessional performance, the result of the proceeding would have been different, *id.* at 694.

Whiteman does not challenge any aspect of her sentence. As to the claims regarding her guilty plea, she must allege facts supporting an inference that it was unreasonable for counsel to advise her to avoid trial and that she had a realistic

9

chance of a more favorable verdict or sentence if she had opted for trial. *See, e.g., Hill v. Lockhart*, 474 U.S. 52, 59–60 (1985). As to the claim regarding appeal, Whiteman must allege facts supporting an inference that counsel knew or should have known she wanted to appeal. *See Roe v. Flores-Ortega*, 528 U.S. 470, 480 (2000).

### A. J.T.'s Testimony

Whiteman alleges that she has "witness statements that support my (non)involvement with this crime." Am. § 2255 Mot. (Doc. 401) at 4 ¶ 5A(i).

The Court asked Whiteman to "explain who those witnesses are, what information they would give, and when and how she learned about the witnesses and their statements." Order (Doc. 402) at 1.

Whiteman responded:

> Witness [J.T.] will testify that Defendant/Movant was not outside the car with co-defendants Dimarzio Sanchez and Frank Sanchez when gasoline was poured on R.R. and the match was lit. Defendant/ Movant learned about the statement because she was present in the car with J.T. at the scene of the crime.

Resp. (Doc. 403) at 1.

In sum, Whiteman believes that J.T. would testify that both she and Whiteman were in the car when Rides Horse was set alight because, according to Whiteman, that is what happened. The Court ordered the United States to file the pretrial discovery provided to Whiteman's counsel in order to determine whether it

10

gave counsel reason to believe J.T.'s credibility might be attacked in a way material to the case against Whiteman. Viewed in light of the record, Whiteman's allegations do not support an inference that counsel's advice to plead guilty was unreasonable.

First, at Dimarzio's trial, J.T., along with S.F. and Frank, testified that Whiteman was outside the car when Rides Horse was doused with gasoline and set on fire. *See* 1 Trial Tr. at 88:14–89:9, 115:5–10 (J.T.); 3 Trial Tr. at 271:12–272:2, 308:4–6 (S.F.), 454:4–17 (Frank). J.T. also testified that Whiteman threatened her by saying, "[Y]ou were there. If you ever tell anybody, you would end up just like [Rides Horse]." 1 Trial Tr. (Doc. 326) at 109:24–110:3.

Second, contrary to her trial testimony, J.T.'s pretrial statement indicated Whiteman was *inside* the car when Rides Horse was set alight. *See* Whiteman Discovery DVD (Doc. 406) Bates 155–156, J.T. Recorded Interview at 21:10–22:30, 24:35–25:08. J.T.'s grand jury testimony was not clear on the point, but it did not contradict her pretrial statement. *See id.* J.T. Grand Jury Tr. at 24:8–25:7. At Dimarzio's trial, Whiteman said she read all the other witnesses' pretrial statements, including J.T.'s, before pleading guilty and talking to case agents. *See* 3 Dimarzio Trial Tr. (Doc. 328) at 381:23–383:3.[2] Thus, Whiteman knew, *before*

---

[2] She also acknowledged calling family members from jail and asking them to obtain a statement from J.T. placing her "in the car" when Rides Horse was set on fire. *See id.* at 369:19–370:6.

11

she pled guilty, that J.T. might testify consistent with her pretrial statement and place Whiteman inside the car when the fire was lit—exactly what she now says should lead to a different outcome in the case. And yet she decided to plead guilty anyway.

Third, Whiteman's conviction did not depend on whether she was in the car or out of the car. The indictment charged first-degree murder *and* aiding and abetting first-degree murder. *See* Indictment (Doc. 16) at 1–2; 18 U.S.C. § 2. The United States had evidence indicating the incitement to murder Rides Horse came from Whiteman. Whiteman fought with Rides Horse. She told Dimarzio not to take Rides Horse to Crow Agency (as they had originally planned to do) but to "turn this car around" or "[d]rop this bitch off." When Dimarzio stopped the car, Whiteman continued to fight with her. Whiteman choked Rides Horse until she gasped for air and defecated. And, when Whiteman pled guilty and testified at Dimarzio's trial, she represented these facts to be true.[3] *See* Change of Plea Tr. (Doc. 179) at 29:14–34:24; 3 Dimarzio Trial Tr. (Doc. 328) at 350:3–359:17 (Whiteman). Her own view of the case confirmed the first four points that J.T., S.F., and Frank agreed on, *see supra* at 4–5, differing only as to the fifth. Even if J.T. were to testify as Whiteman now suggests, Whiteman would still be guilty of

---

[3] The Court recognizes that Whiteman would not have had a plea colloquy or testified at Dimarzio's trial but for her guilty plea. Nevertheless, it must assume she told the truth in her plea colloquy and at trial.

12

aiding and abetting first-degree murder.

Whiteman's allegation about what J.T. would say does not complicate or materially qualify the picture painted by all the evidence. There is no reason to infer either that counsel did anything unreasonable or that Whiteman lost a realistic chance at acquittal as a result. Neither prong of the *Strickland* test is met. This claim is denied.

### B. Understanding of Plea

Whiteman contends "I didn't know that I have rights to a trial" and "[n]o defense strategy was ever discussed." *See* Am. § 2255 Mot. (Doc. 401) at 4 ¶ 5A(i). She also alleges that she was "very scared and intimidated," *id.* at 4 ¶ 5B(i), and entered into the plea agreement "under duress and without me fully understanding what the deal entailed," *id.* at 5 ¶ 5C(i).

Viewed in light of the record, these allegations fail to support an inference that counsel's performance was unreasonable or that counsel might have obtained a better outcome if Whiteman had chosen to stand trial. *See, e.g.*, Change of Plea Tr. (Doc. 179) at 11:10–15:15, 16:10–17:5, 23:3–26:10. The defense strategy was to reach a plea agreement with the United States in order to avoid the statutory life sentence. Counsel accomplished that goal.[4] Neither Whiteman's allegations nor

---

[4] Dimarzio did not accomplish that goal. He was convicted at trial and is now serving a life sentence. *See* Dimarzio Verdict (Doc. 260) at 1; Dimarzio Judgment (Doc. 382) at 2.

13

anything in the record of the case suggests she might have had a realistic defense to present at trial or that her decision to plead guilty was involuntary. This claim is denied.

### C. Coercive Plea Offer

Whiteman contends that her lawyer "informed me that if I did not accept the plea [offer], the prosecutor would give the same plea offer to my co-defendant, Mr. Dimarzio, and that I would be the one with the life[] sentence." Am. § 2255 Mot. at 5 ¶ 5C(i).

"A guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void. A conviction based upon such a plea is open to collateral attack." *Machibroda v. United States*, 368 U.S. 487, 493 (1962), *quoted in United States v. Seng Chen Yong*, 926 F.3d 582, 591–92 (9th Cir. 2019). But, by spelling out one of the likely consequences of rejecting the offer, counsel's advice here *enhanced* the voluntariness of Whiteman's decision. She had to know the offer was pressing and might be rescinded. Only by failing to communicate that fact could counsel perform unreasonably.

Further, counsel had no legal basis to object to the prosecutor's alleged statement. A defendant's guilty plea is not involuntary if it is entered to avoid the death penalty, *see, e.g., United States v. Brady*, 397 U.S. 742, 755 (guilty plea entered to avoid death penalty not involuntary), or to prevent prosecution of a

14

family member who likely participated in a crime, *see Seng Chen Yong*, 926 F.3d at 591. Likewise, a guilty plea entered to obtain favorable treatment before someone else does is not involuntary.

Neither prong of the *Strickland* test is met. This claim is denied.

**D. Failure to Appeal**

Finally, Whiteman contends that she "was not advi[s]ed by . . . legal counsel that I had a right" to appeal. Letter (Doc. 399) at 1. An attorney who fails to fulfill a client's specific request to file an appeal performs unreasonably. And counsel must consult with the defendant about appeal when the defendant might rationally want to appeal or when the defendant has personally expressed an interest in appeal. *See Roe*, 528 U.S. at 476–80. If counsel performs unreasonably in these respects, the prejudice prong of *Strickland* is necessarily met, because counsel's performance causes the defendant to lose her right to appeal. *See id.* at 484.

To determine whether Whiteman had a potentially viable claim, the Court asked her to explain "as much as she can" about:

- what counsel did and did not tell her about appeal;

- whether she specifically instructed them to appeal or asked them about appealing, and, if so, when (for instance, before she pled guilty or four months after sentencing);

- whether counsel did or said anything in response;

- whether counsel had any reason to think she wanted to appeal; and

15

- whether she and counsel discussed any grounds for appeal.

See Order (Doc. 400) at 2.

In response, Whiteman stated that she "did not know anything about my right to appeal" and "thought what I went through was the entire procedure." Am. § 2255 Mot. (Doc. 401) at 4 ¶ 5A(ii); *see also id.* at 5 ¶¶ 5B(ii), (C)(ii). She also says, "Shortly after I was sentenced, I received a letter from my lawyer stating how much time I was going to do and that I wouldn't be hearing from them again." *See id.* at 5 ¶ 5C(i).

Whiteman fails to mention that she knew, at the time she pled guilty, that she was waiving her right to appeal. *See* Change of Plea Tr. (Doc. 179) at 4:7–12, 22:18–23:2, 25:13–26:10. Particularly in view of the plea colloquy, her allegations now fail to support an inference that counsel had "reason to think either (1) that a rational defendant would want to appeal . . . or (2) that this particular defendant reasonably demonstrated to counsel that [s]he was interested in appealing." *Roe*, 528 U.S. at 480. And Whiteman does not allege that she instructed counsel to appeal. *See id.*

Whiteman fails to allege facts supporting an inference that counsel did something wrong. She meets neither prong of the *Strickland* test as applied in *Roe*. This claim is denied.

## V. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

The Supreme Court explains that this "threshold question" should "be decided without full consideration of the factual or legal bases adduced in support of the claims." *Buck v. Davis*, __ U.S. __, 137 S. Ct. 759, 773–74 (2017) (internal quotation marks and citation omitted).

From a district court's perspective, the COA inquiry is not a threshold question but an exit interview. This Court has fully considered the factual and legal bases of the claims. But, shorn of that consideration, Whiteman's first claim, concerning J.T.'s testimony, does make a substantial showing of the denial of a constitutional right. Only consideration of the record and of Whiteman's claims in light of it demonstrates that the claim lacks substance. A COA will be granted on

17

this claim.

Whiteman's other three claims, however, simply fail to state a claim on which relief may be granted. Despite an opportunity to provide more information that should be within her own personal knowledge, Whiteman did not allege facts sufficient to support an inference that she did not understand what she was doing when she pled guilty or that the United States coerced her to accept its plea offer. And Whiteman neither alleged that counsel failed to comply with her instruction to file an appeal nor provided a "reason to think either (1) that a rational defendant would want to appeal . . . or (2) that this particular defendant reasonably demonstrated to counsel that [s]he was interested in appealing." *Roe*, 528 U.S. at 480. A COA is denied on those claims.

Accordingly, **IT IS ORDERED**:

1. Whiteman's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Docs. 399, 401, 403) is **DENIED**.

2. A certificate of appealability is **GRANTED** as to the first claim, regarding J.T.'s testimony, and **DENIED** as to the remaining claims. The clerk shall immediately process the appeal if Whiteman files a Notice of Appeal.

3. The Clerk of Court shall ensure that all pending motions in this case and in CV 19-80-BLG-SPW are terminated and shall close the civil file by entering

judgment in favor of the United States and against Whiteman.

DATED this 24th day of March, 2020.

*Susan P. Watters*
Susan P. Watters
United States District Court